UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TARKETT USA INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:24-cv-00457-JPH-MKK |
| ) | |
| JENNIFER MAYNARD, ) | |
| ) | |
| Defendant. ) | |

**ORDER DENYING TARKETT'S MOTION FOR A PRELIMINARY INJUNCTION**

Tarkett USA Inc.—a major flooring company—brought this case on March 11, 2024 against its former employee, Jennifer Maynard, who left Tarkett to work for a competitor. The Complaint brings claims for breach of contract and threatened misappropriation of trade secrets. Dkt. 1. Tarkett seeks preliminary injunctive relief that would enforce the post-employment restrictions of an Employment Agreement that Ms. Maynard signed and prohibit her from using or disclosing Tarkett's confidential information or trade secrets. Dkt. 4.

Ms. Maynard, however, has sworn in a declaration that she has not shared and has no intent to share "any non-public information about Tarkett," and has not solicited and has no intent to solicit "any of [her] former Tarkett customers" until "the dispute over the enforceability of [her] Employment Agreement is resolved." Dkt. 26-2. Tarkett has not presented contrary evidence but argues that it's nonetheless "at risk of the wrongful pillaging of its customers." Dkt. 29 at 12. Because on this record Tarkett has not shown that

1

it would suffer irreparable harm without injunctive relief, its motion for a preliminary injunction is **DENIED**.  Dkt. [4].

# I.
# Facts & Background

Tarkett has filed a verified complaint, dkt. 1 at 19, and a sworn declaration from Chris Johnson, its Divisional Vice President of Commercial Sales, dkt. 29-1.  Ms. Maynard has filed declarations from herself and from Jeremy Medina, a Regional Sales Manager with her new employer, Milliken & Company.  Dkt. 26-2; dkt. 26-3.  These facts are based on that evidence, the relevant parts of which are uncontested.

The Tarkett family of companies is "a world-wide leader in flooring and sports surfaces" with more than 12,000 employees.  Dkt. 1 at 2.  It has grown through mergers and acquisitions, including its 2012 acquisition of Tandus Group, Inc. and 2019 merger with Tandus Group's successor company.  *Id.* at 3; dkt. 29-1 at 1.[1]

Ms. Maynard began working for a Tandus company in February 2015 in flooring sales.  Dkt. 1 at 3.[2]  Around that time, she signed an Employment Agreement, agreeing not to reveal any confidential information, including "trade

---

[1] Specifically, Tandus Group merged into Tandus Flooring, Inc. in 2013.  Dkt. 29-1 at 7.  Tandus Flooring then changed its name to Tandus Centiva Inc. in 2014 and merged into Tarkett in 2019.  Dkt. 29-1 at 2, 10; dkt. 1-3.

[2] Tarkett's verified complaint and the Employment Agreement say that Ms. Maynard began working for Tandus Group, Inc., dkt. 1 at 3; dkt. 5-2, but at that point its name had changed to Tandus Centiva Inc.  Dkt. 29-1 at 10.  For the reasons below, the Court does not address at this stage the parties' disputes regarding whether Tarkett can enforce the Employment Agreement.

secrets and other non-public information relating to Company, including, without limitation, information relating to customer identities, potential customers, programs, strategies, analyses, marketing plans, pricing, profit margins" and other non-public information. Dkt. 5-2 at 1. She also agreed not to solicit or do business with "any customer with whom [she] had any contact on behalf of" the company. *Id.* at 2. The Agreement applies during her employment and "for a period of eighteen (18) months after the date that Employee's employment is terminated, regardless of the reason for the termination." *Id.* The Agreement does not, however, prohibit Ms. Maynard from immediately working for a competitor. *See id.*

Ms. Maynard continued in her sales role through Tandus's merger into Tarkett. Dkt. 1 at 7–8. She sold only Tarkett flooring products starting in 2019 and her pay deposits were from Tarkett starting in early 2021. Dkt. 26-2 at 2–3.

In December 2023, Ms. Maynard reported to Tarkett's President that a coworker was sexually harassing her. *Id.* at 3.[3] In January and February 2024, she emailed herself customer lists to "seek[ ] legal advice regarding potential employment discrimination and retaliation claims." *Id.* at 4. Ms. Maynard has "not shared these lists with anyone else other than [her] attorney." *Id.* Those lists show how Tarkett split its customers between Ms.

---

[3] Ms. Maynard provides additional evidence about her sexual harassment and retaliation allegations, but does not argue that they remove any obligation not to use or disclose confidential information or trade secrets. *See* dkt. 26; *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 612 n.3 (7th Cir. 1986).

3

Maynard and its other Indiana sales representative after Ms. Maynard's allegation of sexual harassment.  *Id.* at 3–4.  They include most customers' name, city, and phone number, but do not include information about "customers and their needs; pricing information; statistical information about its sales; and relationships with customers."  Dkt. 5 at 2.

Ms. Maynard gave Tarkett notice of her resignation in February 2024 and her last day with Tarkett was March 8, 2024.  Dkt. 26-2 at 3–4.  Shortly before that last day, Tarkett sent Ms. Maynard a letter about her post-separation obligations to Tarkett, with a copy of the Agreement.  Dkt. 1-6.  Ms. Maynard, through counsel, initially responded that the Agreement was between her and Tandus Group, so she was "unaware of any contractual obligations Ms. Maynard owes to Tarkett" and "will proceed accordingly."  Dkt. 1-7.  After Tarkett provided some of its merger history with Tandus, dkt. 1-8, Ms. Maynard, again through counsel, wrote that she "continue[s] to dispute that Ms. Maynard owes any enforceable post-employment obligations to Tarkett," dkt. 1-9.

Ms. Maynard started working for Milliken & Company—one of Tarkett's competitors—on March 11, 2024.  Dkt. 26-2 at 5.  During the hiring process, Ms. Maynard disclosed the Employment Agreement to Milliken.  Dkt. 26-3 at 3.  She also gave Milliken a commission statement from Tarkett in compensation negotiations, but it "contain[ed] nothing that appears to be secret or confidential information."  Dkt. 26-2 at 5; dkt. 26-3 at 3.

4

Ms. Maynard agreed with Milliken during her hiring that she would not "use or reveal any 'Confidential Information' as defined in the Tandus Group Employment Agreement from any former employer (including Tandus Group and Tarkett) in connection with [her] employment with Milliken." Dkt. 26-2 at 5. On behalf of Milliken, Mr. Medina—who was involved in hiring Ms. Maynard and is her direct supervisor at Milliken—attests that Ms. Maynard's "employment with Milliken & Company is conditioned upon her agreement not to use or reveal any 'Confidential Information' as defined in the [ ] Employment Agreement from any former employer." Dkt. 26-3 at 1, 3. Ms. Maynard has given Milliken the names of fourteen customers she worked with at Tarkett and agreed not to solicit those customers for eighteen months, "provided there is no judicial resolution or settlement that removes the non-solicitation restriction" from the Agreement. *Id.* at 4; *see* dkt. 26-2 at 6.

Ms. Maynard has sworn in her declaration that she has not disclosed or used and has no intent to disclose or use "any non-public information about Tarkett," and has not solicited and has no intent to solicit "any of [her] former Tarkett customers" until "the dispute over the enforceability of [her] Employment Agreement is resolved." Dkt. 26-2 at 6 ¶¶ 28–29.

Tarkett brought this action on March 11, 2024, alleging that Ms. Maynard breached the Agreement and threatened to misappropriate trade secrets. Dkt. 1. Tarkett filed a motion for a temporary restraining order under Federal Rule of Civil Procedure 65, dkt. 4, requesting that the Court enjoin Ms.

5

Maynard from using or disclosing Tarkett's confidential information or trade secrets, including:

> (i)   directly or indirectly utilizing or disclosing Tarkett's confidential information or trade secrets;
>
> (ii)   directly or indirectly, on behalf of herself or any third party, company or entity, solicit[ing], accept[ing] business from or do[ing] business with, or in any way interfere[ing] with Tarkett's relationship with (i) any person, company or entity who was a customer or potential customer of Tarkett and (ii) whom Maynard had direct contact with regarding Tarkett's products at any time during Maynard's employment with Tarkett for eighteen months starting on March 8, 2024;
>
> (iii)   directly or indirectly, on behalf of herself or any third party, (i) raiding, hiring, soliciting, or attempting to persuade any then-current employee of Tarkett or any person who was an employee of Tarkett during the twelve months preceding the termination of Maynard's employment with Tarkett, who possess confidential information of Tarkett, to leave the employ of Tarkett in order to compete with products or services of Tarkett; (ii) interfering with the performance by any such persons of their duties for Tarkett; or (iii) communicating with any such persons for the purposes described in items (i) and (ii) in this paragraph, for eighteen months starting on March 8, 2024.

Dkt. 6.[4]

With the parties' consent, the Court converted the motion for temporary restraining order to a motion for preliminary injunction. *See* dkt. 27; *Decker v. Lammer*, No. 21-1328, 2022 WL 135429 at *2 (7th Cir. Jan. 22, 2022) ("The

---

[4] At the March 25 preliminary injunction hearing, Tarkett withdrew its remaining requests for relief.

essence of a temporary restraining order is its brevity, its ex parte character, and . . . its informality."). The Court held oral argument on March 25, 2024. Dkt. 33.

## II.
## Preliminary Injunction Standard

Injunctive relief under Federal Rule of Civil Procedure 65 is "an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). To obtain such extraordinary relief, the party seeking the preliminary injunction carries the burden of persuasion by a clear showing. *See id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Determining whether a plaintiff "is entitled to a preliminary injunction involves a multi-step inquiry." *Int'l Ass'n of Fire Fighters, Local 365 v. City of E. Chi.*, 56 F.4th 437, 446 (7th Cir. 2022). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Id.* "If these threshold factors are met, the court proceeds to a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545. This "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and

vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). "In the final analysis, the district court equitably weighs these factors together, seeking at all times to minimize the costs of being mistaken." *Cassell*, 990 F.3d at 545.

### III.
### Analysis

As a threshold requirement, Tarkett must show that it would suffer irreparable harm without preliminary injunctive relief. *See Cassell*, 990 F.3d at 545. "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Id.*

Tarkett argues that it would suffer irreparable harm because Ms. Maynard has threatened to breach the Agreement and is "certain" to do so, which would damage customer relationships. Dkt. 5 at 18; *see* dkt. 29 at 10–12. Ms. Maynard responds that Tarkett is not facing irreparable harm because she "has already agreed with her new employer not to divulge trade secrets or confidential information, or to solicit prohibited employees or customers unless and until this dispute is resolved." Dkt. 26 at 17. She has also sworn in a declaration that she has not shared and has no intent to share "any non-public information about Tarkett," dkt. 26-2 at 6 ¶ 28, which by its terms includes information that Ms. Maynard acquired during her employment with Tarkett, such as pricing and profit information, sales statistics, and information about her former customers' specific flooring needs, *see* dkt. 1 at 3, 7. She has also sworn that she has not solicited and has no intent to solicit "any of [her] former

8

Tarkett customers" until "the dispute over the enforceability of [her] Employment Agreement is resolved."  Dkt. 26-2 at 6 ¶ 29.

Against Ms. Maynard's sworn statement to the contrary, Tarkett has not provided evidence to support its allegation that Ms. Maynard's breach of the Agreement is "certain."  *See* dkt. 5 at 18.  To the contrary, Milliken's representative testified that Ms. Maynard "is not in a position to hire other employees" and that her "employment with Milliken & Company is conditioned upon her agreement not to use or reveal any" of Tarkett's confidential information.  Dkt. 26-3 at 1, 3.

The evidence before the Court thus demonstrates that Ms. Maynard and Milliken have carefully considered and implemented appropriate steps to prevent the use of confidential information that Ms. Maynard obtained from Tarkett.  She has unequivocally stated under oath that she has not and does not intend to "solicit[ ] any of [her] former Tarkett customers."  Dkt. 26-2 at 6.  And even for Tarkett customers she was not responsible for at Tarkett, she cannot use non-public information she knows about those customers from her employment with Tarkett.  *See id.*  Mr. Medina has unequivocally stated under oath that Milliken shares these expectations.  Dkt. 26-3 at 3–4.

Tarkett suggests that Ms. Maynard's promise not to use Tarkett's confidential information "rings hollow" because she argues "in the same breath" that Tarkett's customer list is not a trade secret or confidential information, and that the Employment Agreement does not prohibit her from soliciting customers.  Dkt. 29 at 11.  But Ms. Maynard's counsel is obligated to advance

9

potentially meritorious legal arguments, and there's no inconsistency between challenging the Employment Agreement and its scope and agreeing to abide by it while that challenge is litigated.

On the other side of the ledger, Tarkett has not provided any contrary evidence even though it "must prove" imminent irreparable harm.[5] *Bedrossian v. Nw. Memorial Hosp.*, 409 F.3d 840, 844 (7th Cir. 2005). So while some types of damages from the violation of a non-compete "are difficult to prove and quantify" and are thus "a canonical form of irreparable harm," Tarkett has not shown that it's facing that type of damage here. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015). Instead, Ms. Maynard's evidence that she does not intend to use Tarkett's confidential information or trade secrets makes such irreparable damages unlikely.

Tarkett's argument is unconvincing also because it focuses on Ms. Maynard's legal arguments while discounting her sworn testimony. Without evidence casting doubt on the veracity of Ms. Maynard's sworn statements, Tarkett's belief that she will not do as she says, dkt. 29 at 12, is hard to see "as anything but speculative—too much so to warrant the extraordinary remedy of preliminary injunctive relief." *Halczenko v. Ascension Health, Inc.*, 37 F.4th

---

[5] Ms. Maynard did not "threaten" to breach the Agreement in her pre-suit letters, as Tarkett alleges. *See id.* at 8–9, 14. Her first letter was in response to a brief letter from Tarkett that did not address the issues in this litigation, and merely concluded that since she was "unaware of any contractual obligations" to Tarkett, she would "proceed accordingly." Dkt. 1-7. Her second letter said nothing about sharing Tarkett's confidential information with Milliken. *See* dkt. 1-9. Regardless, the Court evaluates Ms. Maynard's statements collectively and gives far greater weight to her sworn testimony than to counsel's pre-litigation statements.

1321, 1325 (7th Cir. 2022).[6] At the hearing, Tarkett resisted this conclusion by relying on *Silver Streak Industries v. Squire Boone Caverns*, which recited the mootness principle that "voluntary cessation of an allegedly illegal activity does not automatically make the issue moot, because the party may begin the activity again." No. 4:13-cv-173-RLY-DML, 2014 WL *5 (S.D. Ind. Jan. 21, 2014). But Tarkett cites no law applying that principle to irreparable harm, and indeed *Silver Streak* denied a preliminary injunction for that reason. *Id.* at *6 ("Silver Streak merely alleges that there will be irreparable harm and fails to provide any supporting facts or business models that would show a loss to its goodwill or competitive market edge.").[7]

In the absence of contrary evidence, the Court accepts Ms. Maynard's sworn statements at face value—and will hold her to them. Given Tarkett's arguments regarding the urgency of resolving Ms. Maynard's post-employment obligations to Tarkett, the Court expects that it stands ready to immediately initiate discovery. Therefore, Tarkett will be able to expeditiously investigate its allegations, including taking depositions and issuing subpoenas, which will

---

[6] Indeed, even if "there are two equally credible versions of the facts the court should be highly cautious in granting in injunction" and "must pay particular attention . . .to whether the movant has satisfied the threshold requirement[ ] of irreparable harm." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986).

[7] Tarkett relies on *BioConvergence LLC v. Attariwala* to argue that it's likely to succeed on the merits of its claims. No. 1:19-cv-1745-SEB-TAB, 2019 WL 6893704 (S.D. Ind. Dec. 18, 2019). Because Tarkett has not shown a likelihood of irreparable harm, the Court does not address likelihood of success on the merits. *See Halczenko*, 37 F.4th at 1326. Moreover, *BioConvergence* found a likelihood of irreparable harm because the defendant "refus[ed] to disclose" what she had taken, had a "persistent pattern of withholding accounts and devices," and "refuse[d] to declare [otherwise] under oath"—facts that Tarkett has not shown to be present here. 2019 WL 6893704 at *14.

11

reveal whether Ms. Maynard and Milliken have been true to their word. Should evidence obtained in discovery show that they have not, Tarkett may renew its request for preliminary injunctive relief.

For the time being, however, Tarkett has not shown that any harm from Ms. Maynard's possession of Tarkett's customer list is irreparable. *See Life Spine*, 8 F.4th at 546 ("[H]arm stemming from lost customers or contracts may be quantifiable if the lost customers or contracts are identifiable."); *accord DM Trans, LLC v. Scott*, 38 F.4th 608, 618–20 (7th Cir. 2022). To start, the uncontradicted evidence is that Ms. Maynard sent herself and used Tarkett's broader customer list solely for seeking legal advice about her harassment and retaliation claims. Dkt. 26-2 at 4. More broadly, harm from lost customers can be irreparable only when they are "not fully identifiable" or when the nature of the market makes "quantifying lost business . . . especially difficult." *Life Spine*, 8 F.4th at 546. Here, Tarkett hasn't presented evidence of either of those things. *See E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705 (7th Cir. 2005) ("The harm plaintiff points to, however, eludes calculation because it is speculative, not because, if it occurred, it could not be quantified. . . . [A] plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries."). To the contrary, the parties appear to agree that the customers at issue are on a list, and the Agreement

presupposes that they can be identified by prohibiting Ms. Maynard from soliciting them.  *See* dkt. 5-1.[8]

In the end, Tarkett has not shown that it is likely to suffer irreparable injury such as the disclosure of trade secrets, or loss of customer goodwill or reputation.  *See Life Spine*, 8 F.4th at 546; *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir. 1994).  It therefore is not entitled to the "extraordinary remedy of preliminary injunctive relief."  *Halczenko*, 37 F.4th at 1325.

## IV.
## Conclusion

Because Tarkett has not shown irreparable harm, the Court need not address the remaining injunction factors.  *Halczenko*, 37 F.4th at 1326.  The **Clerk is directed** to retitle Tarkett's motion for temporary restraining order as a motion for preliminary injunction.  Dkt. [4].  That motion is **DENIED**.  Magistrate Judge Klump is asked to enter a case management plan for resolving this matter expeditiously.

**SO ORDERED.**

Date: 3/26/2024

James Patrick Hanlon
United States District Judge
Southern District of Indiana

---

[8] Chris Johnson's affidavit says that on February 2, 2024—nearly three weeks before Ms. Maynard accepted a position with Milliken, dkt. 26-2 at 5—Ms. Maynard emailed a Tarkett customer, the State of Indiana, recommending a dyed-yarn flooring product that Tarkett does not sell but Milliken does.  Dkt. 29-1 at 4.  Tarkett did not produce the email itself as an exhibit or provide corroborating evidence to support the inference that Tarkett asks the Court to make; that is, that the email is evidence that Ms. Maynard had a plan to solicit the State of Indiana as a customer after she left Tarkett and joined Milliken.  *See* dkt. 29.  This allegation does not support irreparable harm because it is speculative, *see Halczenko*, 37 F.4th at 1325, and because Tarkett has identified both the customer and the product at issue, so any damages would be quantifiable, *see Life Spine*, 8 F.4th at 546.

Distribution:

All electronically registered counsel